UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROWAN COMPANIES INC, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-05-3400 |
| | § | |
| ACADIAN AMBULANCE SERVICE, INC., | § | |
| *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

## I. Introduction

Before the Court is the defendant Acadian Ambulance Service, Inc.'s motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The plaintiffs, Rowan Companies Inc. ("Rowan") and Associated Electric & Gas Insurance Services Limited ("AEGIS"), have responded. Having carefully reviewed the record and applicable law, the Court hereby GRANTS the motion for the reasons set for below.

## II. Factual Background

Rowan seeks indemnity pursuant to a Master Service Agreement ("MSA") entered into on January 1, 2000. Under the MSA, the defendant contracted to provide at least one medic aboard Rowan's drilling rigs operating in the Gulf of Mexico for purposes of rendering medical assistance. AEGIS, Rowan's insurer, joins as plaintiff.

On September 13, 2001, Ronnie Parker, an employee of Rowan at the time, sustained an injury to his right arm while working in the course and scope of his employment aboard one of Rowan's rigs. He was immediately treated by the defendant's medic, Raymond Charles Lee, and was transported to Lafayette General Hospital. The medic administered morphine both on the

rig and during transport.  They were soon joined at the hospital by Ken Bartig, a supervisor employed by the defendant.

Parker was initially treated by an emergency room physician, who administered Toradol and recommended that he visit an orthopedic specialist to help alleviate the swelling. Meanwhile, Rowan dispatched its regularly retained physician, Dr. Michael Duval, to the hospital to evaluate Parker.  Dr. Duval cleared Parker to return to the rig, and prescribed Vicoprofen and Keflex.

Bartig and the medic transported Parker from the hospital to a crew boat that was to return him to the rig.  However, while en route, they stopped at a pharmacy for the purpose of filling the Vicoprofen prescription.  For reasons that are not all together clear, this task was not accomplished.  Instead, Bartig and/or the medic contacted Dr. Ross Judice, the defendant's medical director, via phone who approved of substituting Toradol for Vicoprofen.  Parker returned to the rig, and was treated by the medic for four days without Vicoprofen.

By September 17, 2001, Parker had left the rig and sought outside medical attention.  He was treated by Dr. Duval and other specialists, though his injury did not improve.  In December of 2001, Dr. Keith Melancon diagnosed Parker with Reflex Sympathetic Dystrophy (RSD),[1] a chronic neurological pain disorder.  Parker eventually lost use of his right arm; he ultimately lost use of both legs.  He is now a triplegic.

In February of 2003, Parker sued Rowan in federal court ("the *Parker* litigation").  He claimed, in part, that: (1) Rowan was negligent, (2) he was not given proper medical care, and (3) he was entitled to maintenance and cure.  The defendant was not a party to the suit.  Prior to trial, Rowan deposed Ken Bartig and Dr. Richard Morse, Parker's then treating physician, on February 16 and 26, 2004, respectively.  Dr. Morse expressed an opinion that failure to

---

[1] RSD is also referred to as Complex Regional Pain Syndrome (CRPS).

administer Vicoprofen to Parker during the four-day period he was treated aboard the rig was a risk factor that contributed to the onset of RSD; and that adequate pain control would have reduced the chance of Parker developing the disorder.

In preparation of a March 12, 2004, settlement conference, Rowan and Parker retained experts to prepare life care plans outlining the anticipated costs of treatment and services Parker would require for the remainder of his life. The plans estimated costs between $13.6 and $16.5 million. Based on these calculations, Rowan contends that it opted to settle in order to reduce its liability. Rowan ultimately agreed in principle to pay $9 million for a release of "all claims arising out of the incident which [] Parker was injured, as well as any subsequent activities and treatment [Parker] received." The released parties included Rowan and others, specifically including the defendant. The terms of the agreement were read into the record, with counsel for Rowan stating that Parker would also be required to execute its "standard receipt and release hold harmless indemnification agreement." Parker's indemnity obligation was to extend only to those claims brought by him or brought by other persons through him.

The defendant neither participated in settlement negotiations, nor had knowledge that negotiations were ongoing. The court entered an order of dismissal on March 22, 2004, reserving the right to reopen the case if the settlement was not consummated within sixty-days.

On March 31, 2004, Rowan provided the defendant notice for the first time via letter advising that: (1) an agreement had been reached to settle the *Parker* litigation; (2) the defendant may have an obligation to indemnify Rowan pursuant to the MSA; and (3) the defendant may either approve of the settlement or participate in the settlement that was scheduled to be executed on April 6, 2004. The defendant replied on April 5, 2004, requesting additional time in which to

respond.  Rowan apparently declined.  That same day, Rowan and Parker reduced their March 12, 2004, agreement to writing.

The written agreement was essentially identical to the March 12, 2004, agreement except that it conspicuously excluded the defendant as a released party.  Thereafter, Rowan made demand on the defendant's insurers for indemnity without success, contending that the defendant's acts or omissions – in failing to procure and administer Vicoprofen – caused Parker's condition.  On August 22, 2005, Rowan filed suit in Texas state court seeking to recover all or a portion of the funds expended to settle the *Parker* litigation pursuant to the MSA indemnity provision.  The suit was removed to this Court,[2] jurisdiction premised on diversity.

## II. Contentions of the Parties

### A. The Defendant's Contentions

The defendant contends that summary judgment is appropriate for the following reasons: (1) the March 12, 2004, settlement agreement released all claims against it; (2) Rowan ought to be judicially estopped from taking a position that contradicts a position taken in the *Parker* litigation; (3) because Rowan waited more than a year to bring suit, laches operates to bar the claim; (4) Rowan's claim is also barred as a result of Rowan's failure to provide notice or give a meaningful opportunity to participate in negotiations or to assume a defense; (5) the MSA does not require the defendant to indemnify Rowan for injuries to Rowan's employees; (6) its alleged acts or omissions are beyond "Scope of Work"; and (7) its alleged acts or omissions cannot be shown to be the proximate cause of Parker's condition.

---

[2] In its Second Amended Complaint, Rowan alleges only two counts.  Count One seeks recovery pursuant to the indemnity provision of the MSA.  Count Two alleges breach of contract for failure to perform work under the MSA with due diligence and in a good and workmanlike manner.

B. Rowan's Contentions

Rowan contends that the written agreement executed on April 5, 2004, supersedes the March 12, 2004, agreement, and therefore, its terms control.  That being the case, the defendant is expressly excluded as a released party.  Rowan also contends that it provided written notice on March 31, 2004, but the defendant chose not to participate in negotiations.  In the alternative, Rowan contends that notice is not required to recover pursuant to a written indemnification agreement.  Rowan next contends that it does not take a contradictory position, and that laches does not apply to its legal claim.  Finally, Rowan relies on the proffer of testimony of Dr. Richard Morse to show that the defendant's acts or omissions were the single most important risk factor contributing to Parker's RSD.

## IV. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  "The [movant] bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex v. Catrett*, 477 U.S. 317, 322-325 (1986)).  Once the movant carries this initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).  The nonmovant must go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmovant may not rest on conclusory allegations or denials in its pleadings that are

unsupported by specific facts.  FED. R. CIV. P. 56(e).  "[T]he substantive law will identify which

facts are material."  *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).  In determining

whether genuine issues of material fact exist, "factual controversies are construed in the light

most favorable to the nonmovant, but only if both parties have introduced evidence showing that

a controversy exists."  *Lynch*, 140 F.3d at 625.  "A dispute regarding a material fact is 'genuine' if

the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party."

*Roberson v. Alltel Info. Servs*., 373 F.3d 647, 651 (5th Cir. 2004).  Thus, "[t]he appropriate

inquiry is 'whether the evidence represents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Septimus v.

Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251-252).

## V. Analysis & Discussion

### A. The Written Agreement Controls

As previously set forth, on March 12, 2004, Rowan and Parker reached an agreement in

principle to settle the *Parker* litigation.  The terms agreed upon were read into the record.  In

exchange for $9 million, Parker agreed to the following:

> [A] release of all claims arising out of the incident which Mr. Parker was injured,
> as well as any subsequent activities and treatment he received since, to be
> included as parties release[d], not by limiting it to them, is Newfield Exploration,
> [the defendant], Rowan and related entities and insurers, Doctors Cenac, Duval
> and Lafayette and Terrebonne General.

Parker also agreed to execute Rowan's "standard receipt and release hold harmless

indemnification agreements," which provides full indemnity and defense for all present and

future claims.  Counsel for Rowan clarified that "all claims" included any derivative claim

through which Parker is the original source.

Despite the fact that the March 12, 2004, agreement was subsequently reduced to writing, the defendant contends that it is nevertheless binding and its terms expressly inure to its benefit as an intended third-party beneficiary.  In particular, the defendant points out that Rowan and Parker expressly named it as a released party against "all claims" arising out of the incident in which Parker was injured; as well, Parker agreed to provide full indemnity for all future claims.  In the defendant's view, "all claims" encompass Rowan's present indemnity claim.  Hence, the defendant seeks summary judgment on the basis of settlement and release.  In the alternative, it seeks indemnity from Parker.  Both contentions are without merit.  First, the benefit created by the March 12, 2004, agreement was extinguished by the written agreement.  Second, Parker is not a party to the instant suit.  Even if he were, Parker's indemnity obligation extends only to claims brought by him or by other persons through him.

On April 5, 2004, Rowan and Parker reduced the March 12, 2004, agreement to writing. The terms substance of the agreements are virtually identical, except that the defendant is expressly excluded as a released party in the written agreement.  In effect, the March 12, 2004, agreement was modified.  Nonetheless, the defendant contends that as an intended third-party beneficiary, it may still enforce the terms of the pre-modified agreement.  Not so.

Contracting parties retain the power to modify their agreement, including as well, a benefit created in favor of a third party.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 311(2) (1981).  However, the power to modify terminates the moment the beneficiary (1) materially changes position in justifiable reliance on the agreement, (2) brings suit pursuant to the agreement, or (3) otherwise manifests assent to the agreement.  *Id*. § 311(3).

The defendant was an intended third party beneficiary under the March 12, 2004, agreement.  However, while this may be true, the benefit created in its favor – release and/or

indemnification – disappeared on April 5, 2004.  Rowan and Parker were free to modify their agreement as they pleased; they in fact exercised this freedom by excluding the defendant as a released party.  Neither is there argument nor record support to suggest that the defendant relied to its detriment on the agreement.  Also, there are no other grounds that might otherwise operate to restrict Rowan and Parker's power to modify.  In fact, the record shows that the defendant had no independent knowledge prior to April 5, 2004, that it was a released party; by virtue of Rowan's notice letter sent March 31, 2004, it knew only that an agreement had been reached.  Simple application of basic contract principles teaches that the defendant may not rely on the March 12, 2004, agreement as a basis for a release and/or indemnification defense.

In addition, Parker's indemnity obligation would extend only to claims brought by him or brought by other persons through him.  It is quite clear that Rowan seeks indemnification pursuant to its own right pursuant to the MSA, rather than through Parker.  Accordingly, even if the March 12, 2004, agreement survived, Parker's indemnity obligation does not extend to Rowan's contractual indemnity claim against the defendant.  Both contentions fail.

B. Judicial Estoppel

The defendant next contends that one or more of Rowan's positions in the present litigation contradicts one or more positions it took during the *Parker* litigation.  As a consequence, the defendant seeks to prevent Rowan from now changing positions.

Judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding."  *Hall v. GE Plastic Pac. PTE, Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996)).  The doctrine is intended to prevent litigants from "playing fast and loose" with the courts to suit exigencies of self interest.  *Id.*  Two bases must be satisfied

before estoppel applies: first, it must be shown that the position of the party to be estopped is clearly inconsistent with a previous one; second, that party must have convinced the court to accept that previous position. *Ahrens v. Parot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000) (quotations omitted).

In the main, Rowan's present position is that Parker's condition is a result of substandard medical care provided by the defendant following Parker's precipitating injury that occurred on September 13, 2001. To illustrate the contradiction, the defendant points to the April 5, 2004, settlement agreement, in which Rowan: (1) admits liability for the events causing the injury to Parker's arm, and (2) denies that Parker's condition is directly or indirectly related to or was caused or aggravated by any subsequent medical care.

The Court is not persuaded that Rowan's position(s) contradicts one or more previous positions. The defendant misconstrues what exactly Rowan admits to in the April 5, 2004, agreement. Although Rowan "admit[s] liability for the occurrence of the accident," the accident which the agreement refers to is the injury to Parker's arm on September 13, 2001. This does not include the medical care provided to Parker subsequent to the injury. Furthermore, the admissions and denials relied upon by the defendant are lifted from the scribes of a settlement agreement in which the defendant is not a party. Litigants resolve their differences by agreement for a myriad of reasons. Hence, admissions and denials found in such agreements should be given little, if any, probative value in determining facts that may bear upon a party's liability in subsequent and separate litigation. *See* FED. R. EVID. 402.

In addition, the defendant must show that Rowan convinced the previous court to accept its position. The purpose of this requirement is to minimize the danger of a party contradicting a court's determination based on that position. *Hall*, 327 F.3d at 398. Because Rowan and Parker

settled their differences prior to trial, the court did not and was not required to make a determination.   In the end, there is no threat to judicial integrity.   Judicial estoppel is not warranted here.

C. Laches

The defendant also contends that laches is a complete defense to Rowan's indemnity suit. This contention fails because laches is generally unavailable to defend against a purely contractual claim.

Laches may bar a claim if: (1) a plaintiff unreasonably delayed bringing the claim although he had a legal or equitable right to do so; and (2) the defendant acted in good-faith and detrimentally relied on that delay.  *Clark v. Amoco Prod. Co*., 794 F.2d 967, 971 (5th Cir. 1986). However, laches is an equitable remedy generally unavailable to defend against a purely legal claim.  *Id*. ("laches is usually available only in suits strictly in equity or actions at law that involve claims of an essentially equitable character"); *FDIC v. Fuller*, 994 F.2d 223, 224 (5th Cir. 1993) ("in legal actions, laches is not available"); *Three H Enters., L.L.C. v. Advanced Envtl. Recycling Techs., Inc.*, 256 F. Supp. 2d 568, 590 (W.D. Tex. 2002) ("because [the plaintiff's] claim is based purely upon a legal right, *i.e.* breach of contract, the doctrine of laches is inapplicable").

The nature of Rowan's claim is purely legal.  It seeks to recover funds expended to settle litigation pursuant to a written indemnity agreement.  This is not an equitable claim; nor does it involve a legal claim of an essentially equitable character.  Therefore, the defendant may not rely on laches as a defense to Rowan's purely legal claim.

Even if laches were to apply,[3] the Court finds no circumstances that would prejudice or impair the defendant's ability to defend against Rowan's claim.  The defendant recalls that the precipitating injury to Parker occurred on September 13, 2001, that Rowan provided settlement notice for the first time on March 31, 2004, and that Rowan waited more than a year to file suit. During this period, "critical" records were lost; and the medic who treated Parker aboard the rig died unexpectedly without ever being deposed.

However, the defendant fails to explain the significance of the records or how they were lost.  Rowan sheds light on the matter, explaining that the records, in fact, belonged to the defendant and were lost while in the defendant's possession.  Hence, to prevent Rowan from pursuing its claim on this ground would be egregious indeed.  In addition, while the late medic's testimony would certainly have been convenient, it is not indispensable.  The record is abundant. Any information that the medic would have revealed is accessible through records made by him or through other persons with knowledge.

Because laches is inapplicable to Rowan's claim, and because the Court finds no circumstances that would significantly impair the defendant's ability to defend the suit, summary judgment on this ground is denied.

D. Settlement Notice

The defendant next contends that summary judgment is appropriate because Rowan, as indemnitee, failed to provide notice of the proposed settlement or a meaningful opportunity to either participate in negotiations or assume a defense.  In the defendant's view, as a result, Rowan is not entitled to indemnification because it cannot show the requisite actual liability for Parker's injuries.   The defendant also contends that the $9 million settlement figure was

---

[3] *See, e.g., Barfield v. Howard M. Smith Co.*, 426 S.W.2d 834, 840 (Tex. 1968) ("Generally[,] in the absence of some element of estoppel or such extraordinary circumstances as would render inequitable the enforcement of petitioners' right after delay, laches will not bar a suit short of the period set forth in the limitation statute").

unreasonable.   Rowan, on the other hand, contends that: (1) it provided the defendant with adequate notice; (2) it need only show potential, rather than actual, liability; and (3) the settlement was reasonable in light of the anticipated costs of maintenance and cure.

Initially, the Court finds that Rowan failed to provide notice and a meaningful opportunity to either participate in negotiations or assume a defense.  In a March 31, 2004, letter, Rowan notified the defendant for the first time that: (1) an agreement had been reached to settle the *Parker* litigation; (2) the defendant may have an obligation to indemnify under the MSA; and (3) the defendant may either approve of the settlement or participate in the settlement that was scheduled to be executed on April 6, 2004.  The defendant replied on April 5, 2004, requesting additional time in which to respond.  Rowan apparently declined.  That same day, the March 12, 2004, agreement was reduced to writing; and as previously observed, by conspicuously excluding the defendant as a released party, Rowan and Parker had, in effect, modified their agreement.

However, prior to the modification, there is no question that the March 12, 2004, agreement was valid and binding.  That is, prior to April 5, 2004, neither party could unilaterally renege on the terms already agreed to.  And, while notice came prior to the written agreement, the Court finds that Rowan had no intention of providing the defendant with a meaningful opportunity to participate in settlement talks.   First, an agreement was already in place. Participation, therefore, would have been futile.  Second, Rowan provided the defendant less than a week to consider its liability and present its course of action.  In effect, the timing of Rowan's notice suggests that it intended to provide no notice at all.

Notwithstanding this conclusion, Rowan's ability to recover funds expended to settle the *Parker* litigation is not lost necessarily.  The general rule requires an indemnitee to show actual,

rather than potential, liability where no notice is provided.  *Mesa v. Fontenot*, 791 F.2d 1207, 1216 (5th Cir. 1986).  However, where the indemnitee's claim is based on a written contract of indemnification, it need only show potential, rather than actual, liability.  *Id.* at 1216-17; *see also Molett v. Penrod*, 826 F.2d 1419, 1429 (5th Cir. 1987) (holding that actual liability is not required if the indemnitee's claim is founded on a written contract).  The defendant relies on *Whisenant v. Brewster-Bartle Offshore Co.*, 446 F.2d 394 (5th Cir. 1971), to suggest that Rowan must establish actual liability.  However, *Whisenant* and similar cases[4] have a distinguishing characteristic: indemnification was not premised on a contractual agreement.  Because Rowan seeks indemnification pursuant to the MSA, it need only show that it was potentially liable.

In this regard, a court confronted with a valid indemnity agreement "should insure that the claim was not frivolous, that the settlement was reasonable, that it was untainted by fraud or collusion, and that the indemnitee settled under a reasonable apprehension of liability." *Fontenot*, 791 F.2d at 1218.  The defendant does not contend that Parker's claim was frivolous or that the settlement was a result of fraud or collusion.  The Court as well finds that because Parker's precipitating injury occurred while he worked in the normal scope and course of his employment, Rowan settled under a reasonable apprehension of liability.

The defendant contends, however, that $9 million was an unreasonable settlement amount in view of the fact that Rowan had the opportunity to settle for only $5 million.  In support, the defendant points to a September 16, 2002, letter in which counsel for Rowan explained that Parker's settlement demand of $5 million was unreasonable.  However, counsel also indicated that Rowan remained open for further discussions.  It is apparent from the date and

---

[4] *See, e.g., Whisenant v. Brewster-Bartle Offshore Co.*, 446 F.2d 394 (5th Cir. 1971) (claim for indemnity based on implied warranty of workmanlike service); *Molett v. Penrod Drilling Co.*, 826 F.2d 1419 (5th Cir. 1987) (tort-based indemnity claim); *Burke v. Ripp*, 619 F.2d 354 (5th Cir. 1980) (tort-based indemnity claim); *Parfait v. Jahncke Srvc., Inc.*, 484 F.2d 296 (5th Cir. 1973) (claim for indemnity based on implied warranty of workmanlike performance).

context of this letter that Rowan and Parker had engaged in settlement discussions well before

suit was ever filed.  With this in mind, many of the facts underpinning Rowan's decision to settle

for $9 million were not yet known during this early period; they were brought to light months,

even years later.  For example, Dr. Morse's testimony had not yet been taken; nor had his

opinions been revealed.  In fact, Parker had barely begun treatment under Dr. Morse's care.  In

addition, the life care plans that anticipated the cost of maintenance and cure had not yet been

provided.  Simply because Rowan could have settled for a lesser amount years prior does not

necessarily make the eventual settlement unreasonable.

Rowan points to the life care plans that estimated the cost of maintenance and cure

upward to $16.5 million.  The defendant does not contest the plausibility of these estimates.

Moreover, the potential for greater liability was also present if the case had gone to verdict.

Without any other grounds, the Court finds that $9 million to settle the claims brought in the

*Parker* litigation was reasonable.  In view of this conclusion, the Court also finds sufficient

evidence of potential liability.

E. The MSA Provides for Contractual Indemnity

The defendant also seeks summary judgment on grounds that (1) the MSA does not

provide for contractual indemnification for injuries to Rowan employees, and (2) the acts or

omissions made the bases of Rowan's indemnification claim are beyond "Scope of Work"

outlined under the MSA.  To address these arguments, the Court must consult the language of the

MSA.

"Under federal maritime law, [a] contract for indemnity should be construed to cover all

losses, damages, or liabilities which reasonably appear to have been within the contemplation of

the parties."  *Fontenot v. Mesa Petroleum Co*., 791 F.2d 1207, 1214 (5th Cir. 1986) (quoting

*Corbitt v. Diamond M. Drilling Co*., 654 F.2d 329, 333 (5th Cir. 1981)).  But, it "should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Id*.  Moreover, "the contract should be read as a whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous. *Fontenot*, 791 F.2d at 1214.

The indemnity provision upon which Rowan relies is contained in Paragraph 7 of the Special Provisions to the MSA:

> CONTRACTOR'S INDEMNIFICATION FOR MEDICAL CARE: [The defendant] shall at all times be responsible for and hold harmless and indemnify [Rowan], [Rowan's] subcontractors, and any customer for whom [Rowan] is performing work from and against all claims, demands, liabilities, damages and causes of action of every kind and character, including fines and penalties, arising in connection with [the defendant's] failure to properly perform the Scope of Work in favor of the employees, agents or invitees of [Rowan], [Rowan's] customers and subcontractors, and the subcontractors of [Rowan's] customers on account of illness, injury or death or damage to or loss of property.

The plain language of the provision requires the defendant to indemnify Rowan "against all claims … arising in connection with [the defendant's] failure to properly perform the Scope of Work in favor of the *employees*, agents or invitees of [Rowan]." (Emphasis added.)  There is no doubt that Parker was an employee of Rowan during all relevant periods.  Accordingly, the defendant cannot contend that it had no contractual obligation to indemnify Rowan for injuries to Rowan employees.

The defendant next contends that its alleged acts or omissions made the bases of Rowan's claim do not fall under the MSA.  However, the intent of the parties is clear.  Paragraph 2 of the Special Provisions outlines which services comprise "Scope of Work."  Among other things, the defendant was required to "[t]reat all injuries and illnesses aboard the rigs."  In addition, the

defendant warranted to perform this service "with due diligence and in a good and workmanlike manner."  To this end, the Court finds that any reasonable act or course of action that would have fulfilled the parties' intent was necessary and proper.  In this regard, "treatment" of an injury or illness conceivably entails the procurement and administration of prescription pain medicine.  Rowan alleges that the defendant breached its warranty obligation by omitting to perform this service.  Accordingly, the acts or omissions of the defendant made the bases of Rowan's indemnification claim are properly covered under the MSA.

F. Expert Testimony

As a final basis for summary judgment, the defendant contends that its alleged acts or omissions cannot be shown as the proximate cause of Parker's development of RSD or his resulting condition.  In this regard, Rowan relies on the expert opinion of Dr. Richard Morse, as captured in his deposition testimony and supporting affidavit.

Dr. Morse's credentials as an expert in pain management are not disputed.  He is the medical director and attending physician of the Pain Program at Touro Rehab Center in New Orleans, Louisiana.  He has held this position for more than twenty years, and his experience as a pain specialist exceeds thirty.  In July of 2002, Parker was referred to the Touro Rehab Center after being treated separately by Dr. Keith Melancon and Dr. Wendell Helveston.  Dr. Melancon initially diagnosed Parker with RSD in December of 2001.  Between July of 2002 and February of 2005, Dr. Morse was Parker's treating physician.  He was deposed in the *Parker* litigation.  Rowan subsequently retained Dr. Morse, and he was again deposed in support of the present litigation.

Dr. Morse opines that the failure to adequately control Parker's pain during the period he was treated aboard the rig was the single most important risk factor contributing to Parker's RSD.

This conclusion is drawn in part from his underlying theory that inadequate pain control immediately following injury is a major and substantial risk factor contributing to development of RSD.  According to Dr. Morse, his theory is both correct to a reasonable degree of medical probability and generally accepted in the medical community.  The defendant challenges this opinion on grounds that it is not scientifically supported, and therefore, unreliable.[5]  As additional support, the defendant points to the opinion of its own expert, Dr. Sandra Weitz.[6]

The admission of expert testimony in federal court litigation is governed by Federal Rule of Evidence 702.  This rule, by its terms, states that an expert in order to supply opinion testimony must be "qualified … by knowledge, skill, experience, training, or education" and must possess specialized knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702.  In addition, the rule requires that opinion testimony rest on "sufficient facts or data" and reflect the use of "reliable principles and methods" appropriate to the expert's field.  *Id.*  These requirements impose on courts an obligation to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  In other words, courts must determine whether the expert testimony is both reliable and relevant.  *Id.* at 589.

Many factors bear on the reliability inquiry, including, but not limited to, whether the expert's theory: (1) can be or has been tested, (2) has been subject to peer review and publication,

---

[5] The defendant attacks Dr. Morse's proposed testimony in separate motions.  The first [#67] seeks to strike Dr. Morse's supporting affidavit on grounds that it contradicts his deposition testimony.  The second [#75] seeks to exclude Dr. Morse's proposed testimony in its entirety under FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[6] Rowan has filed a reciprocal motion to strike Dr. Weitz's testimony [#81].  In addition, the defendant seeks to exclude the testimony of Rowan's supporting expert Dr. Joseph E. Manno's [#84].  Because the Court does not rely on the proffered testimony of either expert, the respective motions to strike are denied as moot.

(3) has a known or potential rate of error when applied, and (4) is generally accepted in the relevant scientific community. *Id*. at 593-94. The proponent need not prove that the expert's testimony is correct, but only that the testimony is reliable by a preponderance of the evidence. *Moore v. Ashland Chem. Inc*., 151 F.3d 269, 276 (5th Cir. 1998) (en banc). The *Daubert* factors mark the starting point for analysis in the usual case. *Id*. at 275.

Dr. Morse's underlying theory – that inadequate pain control immediately following an acute injury is a major and substantial risk factor contributing to development of RSD – lacks the necessary indicia of reliability. For starters, his theory has not been tested; nor has it been published or subject to peer review. As a result, it has no known or potential rate of error. In fact, Dr. Morse acknowledges that no studies exploring a causal relationship between adequate pain control immediately following injury and later development of RSD exist. This, according to Dr. Morse, is a result of the inherent ethical constraints faced by researchers and the risks faced by patients. Hence, in formulating his opinion, Dr. Morse relies not on proven hypotheses, but rather on the "knowledge, skill, experience, training and education developed during his over thirty [] years of practice specializing in the medical field of pain management." With this alone, Dr. Morse is quite confident that his theory is both correct to a reasonable degree of medical probability and generally accepted in the medical community. However, if not for the complete lack of empirical support, or the apparent inconsistency in his own proposed testimony, these assertions might otherwise carry weight.

Apart from his own observations, Dr. Morse can point to no authority that brings credence to his theory or his contention that it is generally accepted in the medical community. Recognizing this weakness, Rowan seeks to fill the void with several entries from published

research literature.[7]  After careful review, the Court finds that this literature provides little or no support.  Rather, the identified portions provide commentary only in limited areas of: (1) diagnostic criteria; (2) prognosis; (3) post-diagnosis / post-symptomatic treatment regimens; and (4) mechanism hypotheses.  None comment on cause and effect; also, none discuss or identify risk factors that may contribute to development of RSD.  Accordingly, there is no commentary on whether inadequate pain control immediately following injury is a major and substantial risk factor, let alone the single most important risk factor contributing to RSD.

Dr. Morse's closest support appears in one rather isolated paragraph in the work of Dr. John J. Bonika.[8]  While observing that no correlation has been established between the type or severity of injury and incidence of reflex dystrophy, Dr. Bonika indicates that clinical evidence shows that the disorder may be prevented in certain cases.  He notes that "preventative measures include treatment at the site of injury, early and adequate pain relief with analgesic block, and psychologic support of the patient."

In Rowan's view, reference to "early and adequate pain relief" is sufficient support for Dr. Morse's theory.  However, use of Dr. Bonika's rather broad and isolated proposition to support Dr. Morse's more specific theory would prove too much.  Early and adequate pain relief is but one of several preventative measures identified.  Dr. Bonika also gives no indication as to whether "early" refers to the period immediately following injury or some other defined period. More important, Dr. Bonika does not indicate whether this preventative measure is the single most important risk factor contributing to RSD, let alone a risk factor at all.  Accordingly,

---

[7] JOHN J. BONICA, THE MANAGEMENT OF PAIN (Lea & Febiger 1990) (1953); Maike Stengel, et al, *Update on the Diagnosis and Management of Complex Regional Pain Syndromes*, 1 ADVANCES IN PAIN MANAGEMENT 96 (2007); P. PRITHVI RAJ, PAIN MEDICINE: A COMPREHENSIVE REVIEW, (Mosby 2003) (1996); M. Soledad Cepeda, et al, *International Anesthesia Research Society, Comparative Analgesic Efficacy of Patient-Controlled Analgesia with Ketorolac Versus Morphine After Elective Intraabdominal Operations*, 80 ANESTH ANALG 1150 (1995).

[8] JOHN J. BONICA, THE MANAGEMENT OF PAIN 235 (Lea & Febiger 1990) (1953).

reference to Dr. Bonika's commentary does not alone supply reliability to Dr. Morse's theory and derived opinion.

Beyond the *Daubert* criteria, Dr. Morse's seemingly inconsistent conclusion places his theory in further doubt.  In particular, he admits that: (1) RSD is "rare and unpredictable" and may "arise out of the blue"; (2) a person may develop the disorder without any identifiable or known risk factors; (3) no studies exist exploring a causal relationship between adequate pain control immediately following injury and later development of RSD; (4) the generally regarded "window of opportunity" to successfully treat the disorder is six months (rather than immediately following injury); and (5) he cannot quantify or otherwise speak in terms of causation.  These concessions indicate that Dr. Morse's theory is based more on guesswork and speculation, rather than on reliable grounds.

In addition, Dr. Morse fails to identify much less rule out, eliminate, or take exception to other risk factors that may have contributed to Parker's RSD.  More to the point, he fails to explain or make known the process or methodology employed to reach his conclusions.  Based on the record, Dr. Morse formulated his theory on experience, knowledge, and training alone. He reviewed the relevant reports and medical records evidencing the events and circumstances of Parker's precipitating injury, the course of treatment, and his progress.  He concludes that: (1) Parker received inadequate pain relief immediately following injury; and (2) this was the single most important risk factor contributing to Parker's RSD.  Yet, Dr. Morse admits that Parker may well have developed RSD irrespective of the sufficiency of pain treatment received during that period.

In light of these considerations, Dr. Morse's contention that his theory and conclusions are correct to a reasonable degree of medical probability is somewhat incredible, and to permit it

would require the Court to go well beyond the standard set forth in the Federal Rules of Evidence.  Furthermore, it is abundantly clear that Dr. Morse's methodology, or lack thereof, satisfies neither *Daubert*'s criteria nor any other criteria operating in favor of admissibility.  In the end, Dr. Morse's proposed testimony is unsubstantiated and lacks the necessary indicia of "intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1998).  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Id*. at 157 (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The Court is also of the opinion that the probative value of Dr. Morse's proposed testimony is limited indeed.  Though convinced that inadequate pain control immediately following injury was the single most important risk factor contributing to Parker's RSD, Dr. Morse stops short of expressing an opinion as to causation.  Instead, he states that risk factors, rather than causation, is the operative language.  He also states that he cannot assign a percentage of chance that Parker's RSD was a result of inadequate pain control.  And, as previously observed, Dr. Morse concedes that Parker may well have developed RSD irrespective of the sufficiency of pain treatment he received during the relevant period.  The limited nature of this proposed testimony arguably will be of no assistance to the trier of fact in determining whether and to what extent the defendant's alleged acts or omissions were the proximate cause of Parker's condition.

Without Dr. Morse's testimony, Rowan is unable to show that the defendant's acts or omissions were the proximate cause of Parker's development of RSD.  Consequently, summary judgment is appropriate.

## VI. Conclusion

Based on the foregoing discussion, the defendant's motion for summary judgment is hereby GRANTED.

SIGNED and ENTERED this 2nd day of May, 2008.

Kenneth M. Hoyt
United States District Judge